## Monitor Oil Company, et al. v. Hoge, et al.

(Decided April 28, 1925.)

### Appeal from Warren Circuit Court.

1. Corporations—President Estopped to Assert Mortgage as Against Stockholders Fraudulently Induced to Buy Stock.—Where corporation, by its president, represented that it was clear from debts, except running expenses, when in fact the lease constituting its greatest asset had not been paid for, president, who afterwards took mortgage to secure his payments on purchase price, was estopped to assert lien as against stockholders fraudulently induced by such representations to purchase stock.

2. Corporations—Stockholder and Member of Executive Committee Not Precluded by Misrepresentations of President from Recovery Under Mortgage as Against Stockholders Fraudulently Induced.—Stockholder and member of executive committee and one who was not even a stockholder held not precluded by misrepresentations of president of corporation, of which they had no notice and did not authorize, from recovering under mortgage in favor of them and president in preference to stockholders induced by msirepresentations.

J. B. RODES, ALLEN D. MILLER and W. B. GAINES for appellants.

THOMAS, THOMAS & LOGAN and BEN G. WILLIAMS for appellees.

OPINION OF THE COURT BY COMMISSIONER HOBSON— Reversing.

The Monitor Oil Company was incorporated in New Mexico on May 10, 1919, by three corporators who had no real interest in the company but acted at the request of certain gentlemen in Kentucky. A formal meeting was held in New Mexico organizing the company on June 25, 1919. On July 10, 1919, a meeting was held at Louisville, Kentucky, by the Kentucky men who had procured

the proceedings in New Mexico. At this meeting directors were elected. C. A. Phelps was one of the directors and at that meeting C. A. Phelps, trustee, presented to the board of directors eight oil leases covering 963 acres of land in Allen county, and the board took them and issued to Phelps as trustee $150,000.00 of the capital stock at par for the leases. About this time Phelps made a contract with F. A. Kokefair to buy from him the Pat Edmonds lease. This lease had been executed by Edmonds some years before and had been assigned by the original lessee to Kokefair. Kokefair did not then assign it to Phelps. Phelps agreed to pay Kokefair for the lease $65,000.00.

On July 22, 1919, the corporation agreed to buy the Pat Edmonds lease from C. A. Phelps as trustee, at the price of $100,000.00. In this condition of affairs the corporation put the stock upon the market in New York and began selling stock there through a broker on the following written representations made by Phelps as president of the company.

> "The wells under test on the Edmonds lease are producing 100 barrels a day. The Brown lease is estimated to produce 40 barrels a day. The Brown lease lies right in the center of a very prolific pool. Acreage owned by the company is 1,178 acres in the famous Gainesville, Halfway, McReynolds and Adolphus pools of Allen county. 25 wells producing 250 barrels daily. The company has an authorized capital stock of $500,000.00. Of this amount $210,000.00 were issued for property and equipment. 50,000 shares has been sold for cash and the balance remains unissued. Of the balance remaining we are offering for sale 100,000 shares, which when sold will make a total of 360 shares outstanding. The company has no bonds or funded debts, no preferred stock and owes nothing other than current bills. Up to the present time all earnings have been expended for the development of the property."

Accompanying these representations is a map of the company's property, showing the location of the wells, and in the center of the map is Pat Edmonds' lease showing twelve wells located on it. On these representations sent out by Phelps as president of the company the brokers sold in New York and in other eastern states about $25,000.00 of the stock at par or more than

par, these sales being made on the above assurances as to the condition of the company. At this time in fact nothing had been paid on the Edmonds lease and there had been no actual transfer of the lease from Kokefair to Phelps, trustee, or from Phelps, trustee, to the Monitor Oil Company. Thus things ran along until September 23, 1920, when there was a meeting of the board of directors, at which a resolution was adopted that:

"Whereas Phelps had individually paid Kokefair $23,382.69, under a contract to pay him $65,000.00, and whereas Phelps had sold the lease to his associates for $75,000.00 and they had sold it to the Monitor Oil Company for $100,000.00, but had paid on the lease $9,500.00 and the Monitor Oil Company had paid on the lease $13,500.00 in cash and $20,675.70 in the oil runs after the company took charge of the lease; whereas all of the parties have equity in the Edmonds lease and all of the interested parties are willing to transfer the Edmonds lease to the Monitor Oil Company at the original purchase price of $67,058.39, including interest, provided the Monitor Oil Company pays to the syndicate, composed of Hoge, Rogers and Phelps, the sum of $9,500.00 paid by them on the purchase, with interest, and to C. A. Phelps the amount of $23,382.69, with interest, paid by him on the said purchase, and whereas the Monitor Oil Company is indebted to C. A. Phelps individually for operating expenses paid by him in the development and operation of the Pat Edmonds lease and other properties, amounting to $15,912.04, and whereas W. H. Hoge and C. A. Phelps are sureties on a note of the Monitor Oil Company to the Citizens' National Bank amounting to $2,500.00, with interest, it was ordered by the board that the Edmonds lease be accepted on these terms and that the Monitor Oil Company execute and deliver to C. A. Phelps, trustee, and to C. A. Phelps individually a mortgage on the Pat Edmonds lease and its equipment to secure the indebtedness due C. A. Phelps, trustee, for Hoge, Rogers and Phelps and to secure the indebtedness to C. A. Phelps, trustee, as trustee for W. H. Hoge and C. A. Phelps, endorsers on the note, for the sum of $2,500.00, all of this indebtedness to cover interest to date.

It was further provided that the mortgage should stipulate that out of the net returns from the pipe line runs of the Edmonds lease first operating expenses should be paid, and then the sum to W. H. Hoge, C. A. Phelps and John G. Rogers of $9,500.00 should be next paid, and thereafter the intebtedness to C. A. Phelps, and thereafter the note of $2,500.00. A mortgage was accordingly executed and recorded in September, 1920.

On December 11, 1920, W. H. Hoge and the Illinois National Supply Company brought this action against the Monitor Oil Company and C. A. Phelps. They alleged that the Monitor Oil Company was insolvent; that it owed the plaintiffs certain debts which were unpaid; that there were liens on the property of the company, as set out in the mortgage above referred to; that the property was in danger of being lost; that it had no money and no means to operate the property. A receiver was prayed and a judgment settling the rights of the creditors. After this suit was filed a new president of the company was elected and the company filed an answer in which it charged that the claims set out in the mortgage were without foundation and that the Edmonds lease was transferred to the company for stock in the company. H. H. Simms and Louis Newman, suing for themselves and other stockholders to whom the stock had been sold under the representations above stated, filed their petition, charging that these representations were untrue and known to be untrue; that they relied on them as true and were thus induced to part with their money, and that Phelps and Hoge were estopped from asserting any claim against the property of the company until their claims were paid. The issues were made up, proof was taken, a receiver was appointed who took charge of the property of the company, and on final hearing the circuit court held the mortgage valid and directed a sale of the company's property, the proceeds of the mortgaged property to be paid out as therein specified. From this judgment the Monitor Oil Company, Simms and Newman, suing for themselves and their associates, appeal.

It is very clear from the record that the Pat Edmonds lease was not included in the properties which were turned over to the company in consideration of the issue of $150,000.00 of stock at the meeting in July, 1919, in Louisville. So far as the record goes this matter was first presented in the meeting of the directors about a

month later, and it was then presented as a purchase, and the company was to pay $100,000.00 for the lease.

It is also clear from the proof that the Pat Edmonds lease was practically the only developed property of value the company had. The other leases except the Brown lease had not been developed to any appreciable extent, and whether they would prove valuable or not was entirely in the lap of the future. The Pat Edmonds lease had on it a number of producing wells. It was producing daily a large amount of oil. It was the thing that gave the stock of the company value. Without this lease the value of the stock of the company would have been entirely conjectural. The fact that the company had these producing wells on the Edmonds lease, yielding a large amount of oil every day, enabled the brokers in New York to sell the stock. This stock was sold on a prospectus which gave great prominence to Edmonds' lease, and the representations above referred to were made to induce the persons to buy the stock. But in fact the corporation did not then own the Edmonds lease. There had had been no transfer of it to the corporation; it was never transferred until September, 1920, and when it was transferred it was transferred under a mortgage lien for the purchase money. The statement that the company had "no bonded or funded debts, no preferred stock and owing nothing other than current bills" was palpably untrue and was known by Phelps to be untrue, for at the time this statement was made his proposition to turn over this lease to the company for $100,000.00 had been accepted by the company and nothing had been paid by it on the purchase money except the oil runs, which amounted a year later to about $20,000.00. The company then, instead of being as represented, was in fact insolvent unless it made other developments of value, and if the real facts had been told no prudent broker would have offered the stock for sale and no prudent person would have bought it at par.

It is true that Phelps made these representations as president of the company. It is also true that he advanced to the company a large sum of his own money and obligated himself as surety for the company on notes in bank. But he is none the less liable on the misrepresentations he made because he made them, signing the documents C. A. Phelps, president. He put a large amount of his own money in the enterprise. This may illustrate

his good faith and belief in the possibilities of the company. But he did all of this well knowing the real facts. As between him and the innocent stockholders, whose money was obtained upon the faith of his misrepresentations, the loss must fall on him rather than on them. He cannot be permitted to induce them by misrepresentations to put their money in the enterprise and then obtain an advantage over them by reason of the mortgage which he subsequently took. Under the facts Phelps is estopped as against these innocent purchasers of stock to maintain that the corporation owed any part of the purchase money of the Edmonds lease, and as against them he cannot assert any lien on the property for anything that he has paid on this purchase money. The proceeds of the mortgaged property should go to them and not to Phelps under his mortgage, and he should not be paid anything therefrom until they are satisfied.

Rogers was not a stockholder in the company and he is not affected by anything that Phelps said or by any representations that Phelps made. W. H. Hoge was a stockholder in the company and was one of the executive committee, but so far as appears he had no knowledge of the representations made by Phelps upon which the sale of the stock was procured. He did not authorize Phelps to make any representations, and so far as we see from the record Phelps had no authority from Hoge to represent him in the matter of his personal debt or to bind him in any way by what he stated. We, therefore, conclude that Hoge and Rogers are entitled to their rights as given in the mortgage and that the circuit court properly so adjudged. But we cannot reach the same conclusion as to Phelps. It is true it is a hard case on him. He worked faithfully for the company, he put a large amount of his own money in it and tried hard to make it go, but he did all this when he owned a large block of stock and had a personal interest in maintaining the value of the stock. He took the chance well knowing all the facts, and under well settled principles of equity he must bear the loss rather than the innocent persons whom he misled and so induced them to go into the venture with him.

To the extent indicated the judgment is reversed and cause remanded for a judgment in favor of Simms and Newman and their associates as above indicated.